Robert M. KNUTH, on behalf of himself and all others similarly situated, Plaintiffs,

v.

ERIE-CRAWFORD DAIRY COOPERATIVE ASSOCIATION, and others, Defendants.

Civ. A. No. 65-1328.

United States District Court, W. D. Pennsylvania.

April 15, 1971.

Paul A. Simmons, Monongahela, Pa., for plaintiffs.

W. Walter Braham, Jr., Frank L. Seamans, Clyde W. Armstrong, Henry E. Rea, Jr., Pittsburgh, Pa., Errol Fullerton, New Castle, Pa., for defendants.

## OPINION

WEIS, District Judge.

"Milk and honey" sounds of sweetness and serenity in story and song but "milk", "Commission" and "Co-Op" in conjunction connote confusion, contradiction and controversy in this case in court.

This is a class action brought on behalf of approximately 300 of a total of 1200 farmers who were members of the Erie-Crawford Dairy Co-Operative Association during the years of 1957 to 1965. The defendants are the Co-Op itself, its individual directors who served during that period of time, and a number of dairies or dealers to whom Erie-Crawford made sales of milk during the period in question.

Erie-Crawford was an agricultural co-operative organized under the laws of Pennsylvania whose members and dairy customers, sometimes called "handlers", were primarily from the Western Pennsylvania area, concentrated mainly in the Pittsburgh and Erie areas.

The plaintiffs, also designated as "producers", had consigned their milk to Erie-Crawford for sale to the various dairies and claim that as a result of rebates or refunds granted by the Co-Op to the various dairies, the class has been deprived of monies rightfully belonging to it.

Suit was filed on two theories, first, that of violation of the antitrust laws and second, that of a conversion based upon state law.

In earlier proceedings in this case, the Court of Appeals [1] determined that, at

---

1. 395 F.2d 420 (3d Cir. 1968).

least from the standpoint of pleadings, the plaintiffs' allegations were adequate to set forth a claim under the antitrust laws and that this Court could exercise pendent jurisdiction over the count for conversion based on state law.

During the period of time in question, each of the plaintiffs sent his milk to Erie-Crawford in accordance with a form contract providing that the Association was to sell the milk to such parties and by such methods as the Board of Directors deemed to be to the best advantage of the farmer. Authority was also given to "pool" proceeds derived from the sale of milk consigned by other members and to authorize the deduction of certain overhead expenses by the Co-Op. The result was that each milk producer would receive the same adjusted price for his milk regardless of the dairies to whom sales were made, even if at varying prices.

In Pennsylvania the price of milk, both at retail and on sale from the producer to the dairy, is subject to regulation by the State Milk Control Commission.[2] Free and open competition in the industry, therefore, did not exist in Western Pennsylvania during the period under study.

However, the Commission's authority and jurisdiction extended only to sales made in Pennsylvania by Pennsylvania farmers to Pennsylvania dairies. Milk sold by the Co-Op or its producers to customers outside the state was not subject to the milk control price nor was milk shipped into the Erie or Pittsburgh area from outside Pennsylvania subject to control by the Commission.

Western Pennsylvania milk farmers were adversely affected by economic conditions in the early 1950's which developed in this area as a result of the unrealistic prices set by the Milk Control Commission. The mandated price for Class 1 milk (the fluid drinking milk) was higher than that of the similar product which was available in the adjoining States of Ohio and New York.

During this same period, production rose substantially and consequently there were increasing quantities of milk in Ohio and New York which were available to Pennsylvania dairies at prices substantially below that set for the Pennsylvania farmers by Commission fiat.

Although the Commission regulations specified the minimum prices at which sales could be made to the dairies, the Co-Op nevertheless during this period by various methods lowered its prices so that they would be at a similar level to those available to dealers who purchased out of state. This was done by the use of "price adjustments", as the defendants say, or "rebates", as the plaintiffs choose to term the arrangements.

The method of varying the price and the amount of the reduction was accomplished in a number of different ways. However, in each instance the Co-Op would collect the entire amount called for by the Milk Control Commission schedule and then refund the amount of the agreed concession to the dairy by means of a check.

The total amount of the refunds granted by the Co-Op during the years in question totaled more than one and a half million dollars.

Not all of the customers of Erie-Co-Op were granted this price relief and the testimony disclosed that only those customers who complained of lower prices available from out of state producers were given favorable treatment. The reductions were not uniform and the Co-Op did not inform any of its customers, including participants in the arrangements, that some were being given financial preferences.

The refunds were terminated some time in 1965 when minimum price schedules were reduced by the Milk Control Commission and hearings by that body on complaints of the rebating practice were held. Suit was filed by these plaintiffs on December 8, 1965.

At the conclusion of plaintiffs' case, a motion of dismissal was granted as to

2. 31 Purdon's Statutes § 700j–101 et seq.

the counts brought under Section 1 of the Sherman Act but the jury was permitted to pass upon the claim of conversion. Answers to special interrogatories were returned in favor of the plaintiffs against all of the defendants, finding that conversions had taken place, that actual damages had been incurred, and that the Pennsylvania limitation period of six years had been tolled. The plaintiffs have filed motions for a new trial and for summary judgment with respect to the dismissal of the antitrust claim. The defendants have filed motions for new trial and judgment n. o. v. with respect to the count for conversion.

### THE ANTITRUST COUNT

At the time the Court of Appeals considered the plaintiffs' case, there were allegations of three types of conduct violating the antitrust laws, arranged under these headings:

 I. Rebates;

 II. Interstate shipping of Pennsylvania milk;

 III. Boycott.

The latter two of these counts were abandoned at time of trial and the plaintiffs proceeded only on the theory of rebate.

The Appellate Court's analysis of the plaintiffs' Complaint was that "the defendants conspired to fix the price of milk shipped into Pennsylvania by the use of rebates to the processors on milk produced in Pennsylvania and purchased by them from Erie-Crawford. * * * Rebates given solely on Pennsylvania milk allegedly result in the suppression and elimination of competition by preventing the free flow of milk in interstate commerce from sources outside the State of Pennsylvania into the State of Pennsylvania. The object of this alleged combination and conspiracy was to accomplish the raising, fixing, controlling, setting, stabilizing and affecting the price of milk shipped in interstate commerce." (395 F.2d 420, 423–424.)

It was because the plaintiffs failed to produce the facts to sustain these allegations that the dismissals of the antitrust counts were granted.

Unquestionably the plaintiffs did prove that rebates were given to various dairies, in fact this was conceded by the defendants. It seems clear, also, that while the practice of selling milk at prices less than those set by the Commission was contrary to state law, the granting of rebates in and of itself does not establish a violation of the Sherman Act. Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319 (2nd Cir. 1969), cert. den. 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777.

· The plaintiffs failed to establish that prices were "fixed" within the meaning of the antitrust laws; evidence was lacking to prove that there was any restraint imposed upon interstate commerce; and there was no proof that the free flow of milk from sources outside Pennsylvania had been hindered or impaired by the price adjustments.

What the plaintiffs' case did develop was uncontradicted testimony that prices outside Pennsylvania were lower than those set by the Milk Control Commission and that as a result of this unnatural and unfavorable economic climate, Erie-Crawford lost two of its large customers in the early 1950's. In order to prevent the loss of all its markets and to meet competition, Erie-Crawford did agree to lower its prices to meet those offered by Co-Ops which sold milk produced in Ohio and New York. In no instance was there a showing that Erie-Crawford had undercut its rivals but rather it seems that it was content to meet the competition on equal grounds.

In a fact situation like this, to hold that a seller is helpless and must stand by watching its business being destroyed would be a perversion of the result sought to be obtained by the Sherman Act. The antitrust laws were designed to encourage competition and to prevent predatory action. To outlaw the action of the Co-Op in defending its markets by the time-honored and legally sanc-

tioned method[3] of meeting competition would be to turn the shelter of the antitrust legislation into a weapon which would kill free enterprise instead of protecting and promoting it.

Plaintiffs argue vigorously that they proved "price fixing" but actually what they showed fell far short of what was required, because to agree upon a price with a customer in the absence of other circumstances is not within the legal prohibition. Decisional law has established that "price fixing" within the intent of the Sherman Act is either horizontal (dealing with arrangements among competitors)[4] or vertical (attempting to control the resale price).[5] Neither was present in this case.

The Co-Op was not a competitor of the plaintiffs but was simply their agent. It did not and could not attempt to control the resale price of milk since that was already preempted by the Milk Control Commission nor indeed was there any evidence to indicate that any attempts were made in this direction. There was no evidence that any of the dairies had agreed among themselves to set prices at which they would purchase milk from Erie-Crawford. To the contrary, all the evidence was that each price adjustment was set by Erie-Crawford individually with the particular dairy involved without the knowledge of any others. The adjustments were not the same and obviously the Co-Op was attempting to grant the smallest concession necessary in order to retain the business of the particular handler.

There was no showing of any restraint upon interstate commerce. The mere fact that an inference might be drawn that because Erie-Co-Op met the price of out of state milk and that consequently some of it was not shipped into and sold in Pennsylvania does not establish an unlawful restraint upon trade in the circumstances of this case. To hold otherwise would be to legalize and sanction predatory activity by the out of state milk suppliers who could flood the Pennsylvania market with their product and remove the hapless Co-Op and its members from the ranks of effective competition.

Much of the problem in the case was brought about by the collision of two antithetic philosophies—free and open competition as espoused by the Sherman Act versus close and rigid supervision by the state via price control as set out in the Milk Control Law. Plaintiffs and defendants alike seek support in the particular statute which supports their position but both must struggle with the inconsistencies generated by the application of the incompatible legislative enactments.[6]

Although it might be thought to be implicit in the earlier ruling of the Court of Appeals that the plaintiffs have standing to recover damages under the antitrust laws, the full development of the facts which were brought about by the trial tends to cast some doubt upon that assumption.

There is a divergence of view expressed by case law as to the class of people which is entitled to invoke the provisions of the Sherman Act, with the not unusual caveat that much depends upon the factual background.[7]

One of the more recent cases is Billy Baxter, Inc. v. Coca-Cola Company, 431 F.2d 183 (2nd Cir. 1970), cert. den. 401

3. *See* Balian Ice Cream Co. v. Arden Farms Co., 231 F.2d 356 (9th Cir. 1955), cert. den. 350 U.S. 991, 76 S.Ct. 545, 100 L.Ed. 856. Jones v. Borden Co., 430 F.2d 568 (5th Cir. 1970).

4. *E. g.* United States v. Masonite Corp., 316 U.S. 265, 62 S.Ct. 1070. 86 L.Ed. 1461 (1942).

5. Also known as resale price maintenance agreements. *E. g.* Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed. 2d 998 (1968).

6. For a discussion of this problem in another case involving Pennsylvania Milk Commission imposed milk prices, *see* Morton v. National Dairy Products, 287 F.Supp. 753 at 763, 764 (E.D.Pa.1968).

7. *See* Standing to Sue for Treble Damages under § 4 of the Clayton Act, 64 Col.L.R. 570.

U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971), which holds that the plaintiff must show a link indicating that his property loss was in the "target area" of the illegal conduct. The opinion in that case reads:

> "There must be a causal connection between an antitrust violation and an injury sufficient for the trier of fact to establish that the violation was a 'material cause' of or a 'substantial factor' in the occurrence of damage. [citations]. And this connection must also link a specific form of illegal act to a plaintiff engaged in the sort of legitimate activities which the prohibition of this type of violation was clearly intended to protect. While any antitrust violation disrupts the competitive economy to some extent and creates entirely foreseeable ripples of injury which may be shown to reach individual employees, stockholders or consumers, it has long been held that not all of these have the requisite standing to sue for treble damages * * * Consequently, a plaintiff must allege a causative link to his injury which is 'direct' rather than 'incidental' or which indicates that his business or property was in the 'target area' of the defendant's illegal act." (page 187)[8]

As Judge Learned Hand put it in Bookout v. Schine Chain Theatres, Inc., 253 F.2d 292, 295 (2nd Cir. 1958):

> "The action at bar will not lie because all claims under the Anti-Trust Acts rest upon wrongs done by the suppression of competition and must be initiated by a party whose commerce has been directly injured."

See also Harrison v. Paramount Pictures, Inc., 211 F.2d 405 (3rd Cir. 1954).

Here the concessions granted by the Co-Op were not to those in competition with the plaintiffs. If it be assumed, arguendo, that the effect of price reductions was to restrict to some extent the amount of milk flowing into Pennsyl-

vania, this would not be a cause of harm to the plaintiffs but could only be a benefit by increasing their opportunities for sales.

The damages claimed by the plaintiffs were the amount of the rebates. This loss was suffered by the plaintiffs not in an attempt by the Co-Op to restrict its markets but only to protect their very existence.

The parties who might claim to be aggrieved because of the lowering of prices by the Co-Op would have been the out of state producers who were in the target area and who were the ones who could claim loss of sales because of this activity. Certainly the plaintiffs did not fall within this group.

Recognition of the difficulties that are involved in proving conspiracy requires that wide latitude must be given to a party in his effort to prove his allegations but nevertheless the fact remains that the burden here is still on the plaintiffs. There was no testimony whatsoever from which the jury could have been permitted to infer that there was any plan or conspiracy among the various dairies to force a reduction of the price at which the plaintiffs had to sell their milk. The plaintiffs did not prove the elements of conscious parallelism nor any facts from which conspiracy might fairly have been inferred.

Essentially, all that the plaintiffs' case developed was that the Co-Op reduced prices in order to meet competition. This is not in and of itself actionable within the Sherman Act. See Balian Ice Cream Co., Inc. v. Arden Farms Co., supra; Jones v. Borden Co., supra.

The granting of the motion to dismiss was required by the posture of the case on not one, but several grounds.

## CONVERSION

It may seem anomalous that the very same conduct which may appear perfectly legal and blameless in the context of one statute may nevertheless expose the

---

8. *See* comment on this case and a discussion of the "target area" concept by Milton Handler in The Twenty-Third Annual Trust Review, 71 Col.L.R. (1971).

defendants to liability and damages when viewed against a different backdrop. However, this is not unknown to the law and it was not surprising that when the question of conversion was submitted to the jury, it found adversely to the defendants as it could properly do on the evidence submitted to it.

 Conversion has been defined as "an act of willful interference with the dominion or control over a chattel, done without lawful justification, by which any person entitled thereto is deprived of its use and possession." 37 P.L.E. Trespass § 82. See also Cenna v. United States, 402 F.2d 168 (3rd Cir. 1968). Motive or intent, good faith or mistake of law or fact,[9] leading to erroneous belief of right of possession are not defenses. The theory of conversion is based on the general principle that a person is entitled to his property and if another mistakenly or otherwise interferes with the possession of that property or disposes of it without consent of the owner, he is entitled to have it returned nevertheless.

 Pearl Assurance Company v. National Insurance Agency, 151 Pa.Super. 146, 30 A.2d 333 held that under Pennsylvania law money may be the subject of conversion. That case dealt with an assertion by an insurance company that its agent had converted premiums which had been collected from various assureds. The Superior Court said:

> "The obligation resting on the defendants was to collect the premiums and when collected to pay over the amount so collected less an agreed percentage to compensate defendants for their services. The money so collected by defendants, over and above the percentage deductible as compensation for services, never became the property of the defendants, but at all times was the property of the plaintiff insurance company. The transaction totally negatives any idea of a sale on credit of the policies to the defendants or either of them. They never had any

property in them." (page 156, 30 A.2d page 337).

In this case the claim is based upon the premise that the milk was consigned to the Co-Op for sale with the understanding that when payment was received from the buyers, Erie-Crawford was to deduct the amount necessary to meet the agreed overhead charges and pay the remainder to the farmer. When the Co-Op did not remit all of the money but instead rebated part of the funds to the handlers, this constituted a conversion, according to the plaintiffs, because they had not agreed to the refund. The jury specifically found that there had been no consent and that a conversion in fact had occurred.

The defense is that the milk was sold to the dairy on the condition and with the explicit understanding that part of the price would be returned to the buyer. It is argued, therefore, that the plaintiffs never had any property interest in the amount which was subject to refund because this money had been entrusted to the Co-Op by the dealer only for the purpose of compliance with the Milk Commission price schedule. Erie-Crawford says further that the consignment contract which required sales by the Co-Op "to the best advantage of the producer" was authorization to proceed in this manner.

The jury was instructed that every contract must be performed in accordance with the law and when the farmers turned over the milk to the Co-Op, it was with the implied condition that the sale be at the legal price. Further, the Court charged that it was contrary to law for Erie-Crawford to sell to a dairy agreeing to give a rebate, that any agreement to refund part of the purchase price was illegal, and could not be enforced by the dairy involved.

Defendants contend that this instruction was not only erroneous but prejudicial as well.

The Pennsylvania courts have had occasion to pass on various attempts to

9. *See* Morissette v. United States, 342 U.S. 246, 270, 72 S.Ct. 240, 96 L.Ed. 288 (1952).

evade the price structure set by the Milk Control Commission in Pennsylvania and have been firm in refusing to permit any subterfuge. Thus, in Milk Control Commission v. McAllister Farm Dairy, 384 Pa. 459, 464, 121 A.2d 144, 147, the Supreme Court of Pennsylvania said:

"By the cleverly conceived plan of rebates through redemption the actions of the appellant were a plain and simple circumvention of the Commission regulations and of the court's order that milk be not sold below the minimum prices. To have found otherwise than the court did here would have been deliberately to close its eyes to the actual facts."

In Milk Control Commission v. Rieck Dairy Division, 193 Pa.Super. 32, 37, 163 A.2d 891, 894 (1960), the Court said:

"The motive is not important. It is the effect of the transaction which determines whether it constitutes a method or device to sell milk at a price less than the minimum set by the Commission * * *.

"The methods and devices whereby milk can be sold at a price less than the minimum fixed by the commission are as unlimited as the genius of man * * *.

"Milk control is founded upon price control. As soon as dealers find a method or device to break down the commission's control over the price actually being paid, milk control will become chaotic, and soon non-existent. The legislature understood this. It is evident from reading Section 807 of the Milk Control Law, supra, that it attempted, by every conceivable means, to close every 'loop hole' which would enable one dealer to obtain a price advantage over another."

In Shearer's Dairies, Inc. v. Pennsylvania Milk Control Commission, 191 Pa. Super. 574, 577, 159 A.2d 268 (1960), it was said:

"No matter how far we follow the maze of corporative activities and involved contractual relationships, it will bring us back to this procedure, which, in our opinion, constitutes a device to sell milk at a price less than the minimum established by the commission, and is in violation of section 807, supra, of the Milk Control Law. Neither the ingenuity of the contract, nor the intricacies of the corporate structure change this transaction into anything but such a device."

The statute is quite clear that no method is lawful by which milk is sold at a price less than the minimum applicable, whether by rebate, or otherwise.[10] Consequently, the defendants are estopped to invoke their illegal agreement with the dairies in order to show that the plaintiffs had no property in the amount of money which was refunded. There is no doubt that before any specific rebate was made, the farmer had a legally enforceable right as to the funds in the hands of the Co-Op as contrasted with the dairy which would have

10. § 700j–807.
"After the commission shall have fixed prices to be charged or paid for milk * * *, it shall be unlawful for a milk dealer or handler or producer, knowingly or unknowingly, or any other person knowingly * * * to sell * * * deliver * * * make available on consignment or otherwise * * * buy * * * receive * * * offer to sell or deliver * * * purchase * * * milk at any price below the minimum price * * * applicable to the particular transaction.
"No method or device shall be lawful whereby milk is bought * * * sold * * * handled on consignment or otherwise * * * at a price less than the minimum price applicable to the particular transaction, whether by * * * discount * * * rebate * * * extension of credit * * *
"It shall be unlawful for any milk dealer or handler, knowingly or unknowingly, or any other person knowingly * * * to * * * sell * * * deliver * * * buy or receive or handle on consignment * * * milk at a price computed upon false or erroneous weight, * * * butterfat test, grade, classification, or at a price from which have been made deductions, not authorized by law * * *"

been barred by its violation of the Commission regulations.

There was no question of fact to be submitted on this issue, the interpretation of the statute being one for the Court and not for the jury. It seemed to be desirable to explain to the jury the basis for the ruling, particularly in view of the fact that this trial had taken some five weeks to try, that there had been innumerable references to the Milk Control Act, to the prices set by the Commission, and to rebates.

To state that the action of the Co-Op in refunding the money was illegal was not to characterize it as criminal, as defendants assert, nor did the definition amount to a directed verdict of conversion. Whether the plaintiffs had knowledge of the activities of the Co-Op and whether they consented to the price adjustments were still issues of fact to be determined and the jury was told that there would not be a conversion in the event of positive findings to these questions because the element of unauthorized acts of dominion over the property would be lacking.

The instructions containing the Court's interpretation of the Milk Control Act were necessary to present the issues to the jury in unequivocal fashion, particularly since the testimony of the defendants' expert appeared to imply that economic necessity might justify a violation of the state law.

### PENDENT JURISDICTION

Defendants also contend that once the antitrust matter had been dismissed the Court should have refused to exercise pendent jurisdiction over the conversion count. However after a case has been waiting for years to reach the courtroom and then testimony had been taken for several weeks, sound judicial administration dictates that the trial continue to a conclusion. Further-

more, it would not simply be a matter of remanding to the state court or to the Milk Control Commission to proceed to a conclusion because in those forums the statute of limitations could be raised as an almost insurmountable defense to the plaintiffs' cause.[11] Indeed, it would probably have been an abuse of discretion not to conclude the case.

### LIABILITY OF THE INDIVIDUAL DIRECTORS

The jury found that all of the defendants, including the directors of the Co-Op, individually, were liable in conversion. The charge to the jury permitted such a result as to the directors if it were determined that they had knowledge amounting to acquiescense or that they participated in the rebating operation.

The question of the personal responsibility of the directors in this case is a difficult one.

The president of the corporation during most of the period in question, one John Barney, was a salaried employee who actually performed the negotiations with all the dairies with the exception of a few instances when Howard Yost, the vice president, was substituted. Barney apparently was a forceful individual with long experience in the field of milk marketing, including service on the Milk Control Commission. It was obvious that he was the dominant force in the operation of the Co-Op both in day to day activities as well as long range policies. The idea of rebating apparently was his—at least insofar as it was carried out by Erie-Crawford.

It was Barney who met with the representative of the various dairies and bargained for the price adjustments—it was he who instructed the employees of the Co-Op to issue the refund checks—it was he who determined the formula to be used in calculating the price reduc-

---

11. At oral argument on the post trial motions some of the defendants agreed that if the matter were remanded to the Milk Control Commission in conformance with the Act of 1806—*infra*, they would waive the Statute of Limitations. This concession was not made during the trial, however.

tions and, apparently, he also had some conversations with members of the Milk Control Commission about the situation.

By contrast, the membership elected the directors who were farmers not participating in the day to day operation of the Co-op but who only met monthly to review operations generally. For this service they received a fee of $7.00 per meeting plus an allowance for mileage. It was uncontroverted that none of the directors profited personally from any of the conversions.

The director-defendants admitted candidly that they knew of the price adjustments, the rebating, and that they approved of the policy because they thought there was nothing else that could be done to preserve Erie-Crawford's markets.

In considering the legal problem involved, it must be observed at the outset that the standard of duty between a director and the corporation is not applicable because here the plaintiffs are in the position of third parties who seek damages for their personal loss, rather than reimbursement on behalf of the corporation. There appear to be no special circumstances in this case which would require the individual farmers and the directors to deal other than at arms length. Binns v. Copper Range Company, 335 Pa. 257, 6 A.2d 895 (1939); Imbrie v. Community Loan Company, 131 Pa.Super. 398, 200 A. 149 (1938).

As is not unusual, no Pennsylvania decisions clearly rule the issue raised by the facts in this case. One basic principle does emerge from a study of the cases, however—that being that a director is not liable for the tort of a corporation unless he "knowingly participates in a wrongful act." Chester-Cambridge Bank & Trust Co. v. Rhodes, 346 Pa. 427, 31 A.2d 128 (1943).

In Martin v. Wood, 400 F.2d 310, 314 (3rd Cir. 1968), the Court in applying Pennsylvania law held that neither the president nor vice president of a company was individually liable for an employee's personal injuries when neither of the officers "were actually present at the time of the accidents nor had they been in any way physically connected with the operations in the blast furnace area."

Zubik v. Zubik, 384 F.2d 267 (3rd Cir. 1967) refused to fasten personal liability upon a director for loss resulting from the collision of a barge which had been swept from its moorings, even though it appeared that the defendant had some actual knowledge of the dangerous conditions on the river existing before the breakaway. The Court rested its decision on the fact that others in the corporation on whom the defendant relied had actually done the mooring and were aware of conditions on the barge and the river.

Apparently the leading case in this state dealing with a director's accountability for conversion is Cohen v. Maus, 297 Pa. 454, 147 A. 103 (1929). There the court declined to attach legal responsibility to directors who had no actual knowledge of the conversion but could have learned of it by examination of the corporation's books. An additional problem was discussed, similar to our present case, when the Court said:

"The situation would however, seem to be different so far as the defendant Maus is concerned. He was not only a director, but also general manager of the corporation. He not only knew of the sale of the merchandise to plaintiffs, but actually made it. While it is earnestly argued that he did not participate in the resale of their goods and in the conversion, we have reached the conclusion that this question is sufficiently doubtful to warrant its fuller investigation on another trial * * * If Maus actually converted plaintiff's goods, he would be personally liable to them notwithstanding that the proceeds went to the corporation and not to him." (page 457, 147 A. page 104.)

It is significant that the Court seemed to require actual participation in the sale and that mere knowledge of the transaction was not enough.

Then we come to the case of Fisher v. Rose, 319 Pa. 446, 181 A. 507 (1935) which the opinion says is anomalous. There the individual defendant was said to have converted certain stock which had been pledged to the corporation of which he was the president. Conceding that the defendant personally had made the sale, the Court said:

"Under the existing circumstances, however, no inference can be drawn that Rose [the defendant] was acting other than on behalf of his company; certainly we cannot assume such to be true in the absence of specific and direct averment that it was the fact. Rose's acts were therefore, in legal contemplation those of the company, for which he is not, individually, responsible." (pages 447–448, 181 A. page 508)

While it is true that other jurisdictions might agree with the jury's finding in the case at bar,[12] Pennsylvania decisional law indicates that nothing short of direct participation will impose personal liability on a director in the type of circumstance with which we are concerned here. That essential factor was not present and therefore judgment n. o. v. will be entered for the individual defendants.

Defendants' brief concedes that since Yost participated directly, he is not entitled to judgment n. o. v. Barney died before trial commenced and his estate was not made a party to the suit.

## THE ACT OF 1806 AND ITS APPLICATION TO THIS CASE

At the trial and in post trial motions, the defendants contended that the Act of 1806, 46 Purdon's Statute § 156, denied jurisdiction to the court as to a matter encompassed within the Pennsylvania Milk Control Law. The Act reads:

"Acts of assembly to be strictly pursued. In all cases where a remedy is provided, or duty enjoined, or any-

thing directed to be done by any act or acts of assembly of this commonwealth, the directions of the said acts shall be strictly pursued, and no penalty shall be inflicted, or anything done agreeably to the provisions of the common law, in such cases, further than shall be necessary for carrying such act or acts into effect."

Defendants claim that this statute requires the plaintiffs to pursue their remedies against the milk dealers and Erie-Crawford before the Commission exclusively, citing the broad statement of legislative policy in the Milk Control Law, 31 Purdon's § 700j–301:

"The board is hereby declared to be the instrumentality of the Commonwealth for the purpose of administering the provisions of this act and to execute the legislative intent herein expressed, and it is hereby vested with power to supervise, investigate and regulate the entire milk industry of this Commonwealth, including the production, transportation, disposal, manufacture, processing, storage, distribution, delivery, handling, bailment, brokerage, consignment, purchase and sale of milk and milk products in this Commonwealth, and including the establishment of reasonable trade practices, systems of production control and marketing area committees in connection therewith."

No decision of the Pennsylvania courts has held that the Milk Control Commission is the exclusive forum, nor indeed has any appellate decision been concerned with correlation between these two statutes.

The Statutory Construction Act of Pennsylvania, 46 Purdon's § 558, provides in part, that provisions of law decreasing the jurisdiction of a court of record shall be strictly construed.

The Milk Control Act itself does not contain any flat statement purporting to vest exclusive jurisdiction in the Com-

---

12. *Cf.* Armour and Company v. Celic, 294 F.2d 432 (2nd Cir. 1961). *See also* Fletcher, Cyclopedia Corporations §§ 1140, 1142.

mission but defendants point to § 1005, which says in part:

"Appropriate proceedings against any milk dealer[13] violating this act * * *, may be instituted before the Board by any producer to whom the lawful price of milk has not been paid or to whom such price has not been fully paid * * *"

However, we think it is not without significance that the permissive "may" is used rather than "shall" and there is no proviso to prohibit action in the courts. Furthermore, § 1003 provides in part:

" * * * any person * * * may institute such action at law or in equity as may appear necessary to enforce compliance with any provision of this act, or to enforce compliance with any rule, regulation or order of the Board * * *"

The defendants' position is not supported by the wording of the Milk Control Law and far more than mere inference is required to oust the jurisdiction of the common law courts over one of its traditional forms of action. Section 1005 does not provide an exclusive remedy but merely an additional one.

## THE STATUTE OF LIMITATIONS DEFENSE

▬ The count for conversion was filed in this Court on May 31, 1966 but some of the transactions for which the plaintiffs make claim antedated May of 1960, beyond the Pennsylvania 6 year Statute of Limitations.

While the answer to an interrogatory found that the limitation period had been tolled, we conclude that plaintiffs failed to produce adequate evidence to allow submission of this matter for jury consideration and that the defense must be sustained.

The case of Overfield v. Pennroad Corporation, 146 F.2d 889 (3rd Cir. 1944) involved a suit by stockholders against the directors of their corporation. In discussing avoidance of the statute of limitations, the Court of Appeals said:

"The plaintiffs say, however, that there was concealment and such concealment as would toll the running of the statute under Pennsylvania law. We are confronted at the outset, however, with the proposition, laid down over and over again in the Pennsylvania decisions that the concealment which tolls the statute must be in an affirmative, independent act of concealment; mere silence or nondisclosure, even by corporate officials is not enough. The time at which it takes place is immaterial whether before, contemporaneous with or subsequent to the act, complained of. But independent act, 'affirmative efforts to divert, mislead, or prevent discovery' there must be." (page 896)

In a more recent opinion, Walters v. Ditzler, 424 Pa. 445, 227 A.2d 833, 835 (1967), the Supreme Court of Pennsylvania reviewed the requisites for tolling the statute:

"Presently pertinent are certain well settled legal principles: (a) mere mistake, misunderstanding or lack of knowledge do not toll the running of the statute of limitations: [citation] * * * (c) the fraud which will toll the statute and effect and estoppel need not be fraud in the strictest sense, i. e., inclusive of an intent to deceive, but may be fraud in the broad sense, i. e., inclusive of an unintentional deception: [citation]; (d) an estoppel becomes operative only in clear cases of fraud, deception or concealment."

See also Iacaponi v. New Amsterdam Casualty Co., 258 F.Supp. 880 (W.D.Pa. 1966) aff'd 379 F.2d 311 (3rd Cir. 1967) cert. den. 389 U.S. 1054, 88 S.Ct. 802, 19 L.Ed.2d 849 (1968).

---

13. During the period from 1957 to 1965, a cooperative was considered a producer (§ 103). After December 15, 1965, by virtue of an amendment, a cooperative was considered a "dealer" when it had milk on consignment which it sold to dealers.

In this trial there was no testimony whatsoever of any activity by the dairies which could qualify as affirmative acts which prevented discovery by the plaintiffs. There had been no contact between the producers and the handlers, no requests for information, no knowledge of the dealers' accounting procedures, indeed not even the opportunity on the part of these dairies to deceive the farmers.

While it is contended that the jury could consider the fact that Sealtest records for the years of 1957 and 1958 were no longer available at the time suit was filed in 1965, nevertheless the plaintiffs did not and could not show how this affected them. Consequently, it was error to have permitted the jury to pass upon the question when there was no evidence of affirmative acts of misleading or concealment by the dairies directed toward these plaintiffs.

With respect to the individual directors, again, a similar lack of proof is evident.

The plaintiffs asserted that the financial statements which were used as a basis for reports at the annual meeting did not contain any mention of rebates or price adjustments. Also Mr. Knuth testified that in June, 1965 at a Board meeting, he requested an opportunity to view the books of Erie-Crawford but was told that directors were too busy at that time, although he was invited to return when a meeting was not in progress. Knuth did not do so. This evidence fails to meet the test of acts intended to deceive, conceal, or misrepresent which the Pennsylvania Law requires to be proved by evidence that is clear and precise.

As additional evidence against the Co-Op, the producers point to testimony that the Erie-Crawford's accountant made the computation of the various price adjustments in a special notebook which he kept in a separate drawer in his desk and that the corporate records did not clearly reveal the rebates. However, there was no testimony that any plaintiff was deprived of the opportunity to view the corporate records or that any request for explanation or interpretation was ever made.

While there was testimony that the price adjustment problem was presented to one or more annual membership meetings, it was never clearly established in which year or years this was done.

The evidence on this issue produces the impression of an organization which was not particularly interested in making the price arrangements known to the public or to all of its customers and, accordingly, did not go to any pains to draw attention to the situation. This falls short of the requirements of Pennsylvania Law that there be affirmative efforts at concealment. The silence or nondisclosure which was shown by the plaintiffs is not sufficient to overcome the policy of Pennsylvania law to enforce the limitation period in all but severely restricted situations. The Statute of Limitations must be considered a valid defense for all defendants and not a proper matter for jury determination.

## CONDUCT OF PLAINTIFFS' COUNSEL

This was a lengthy trial, tenaciously contested by the lawyers for all parties. There were numerous side comments by counsel during the questioning of the witnesses, mostly by the attorney representing the plaintiffs. Counsel were cautioned by the Court on many occasions to desist but after a short period of compliance, the chatter would commence again.

The defendants have cited numerous instances of alleged prejudicial comments by plaintiffs' counsel and it must be admitted that most were unnecessary and many were objectionable reflections on the credibility of witnesses or the value of certain testimony. Nevertheless, the cold record does not accurately reflect the atmosphere of the trial and many of the remarks in print appear stronger than they sounded in the courtroom. Although many of counsel's observations made in the guise of objections to evidence should not have been

made in the presence of the jury, they were not actually prejudicial. We do not believe that the jury was influenced in favor of one party or another by the exchanges between the lawyers.

■ Complaint is also made that plaintiffs' counsel exceeded the bounds of fair comment in his summation when he spoke of "law and order", the necessity for all to obey the law, and what children were being taught · in college. While the remarks were strong, they fairly met inferences and statements of the defendants' expert whose testimony conveyed an impression of willingness to condone statutory violation, if necessary, in the pursuit of financial profit. The defendants are in no position to complain of the plaintiffs' closing argument —which in this case we do not consider prejudicial.

##### · EVIDENTIARY RULINGS

■ The defendants sought to produce evidence of statements by an accountant employed by the Milk Control Commission, expressing his views on the legality of the rebate procedures. An offer was made, also, to introduce a letter written by the Secretary of the Milk Control Commission, apparently giving tacit approval to the milk price adjustments procedures followed by the Co-Op. This letter said in part:

> " * * * we believe we stated that where a milk dealer paid a producer for milk shipped and the producer voluntarily and without suggestion, pressure, threat or duress, returned the portion of the money voluntarily, the transaction was completed as far as payment to producers was concerned and no violation of the law existed.
>
> "We still feel that this is a proper analysis in a particular situation."

The plaintiffs had originally asked for punitive damages but abandoned that claim as the trial got under way. The proffered testimony might have had some relevancy on the issue of good faith on the part of the defendants so long as the exemplary damage count was viable but when it was removed from the case, the reason for the introduction of the evidence was no longer applicable. The evidence would have had no further pertinency to the issues and might have resulted in confusion in the juror's mind as to the proper interpretation of the Milk Control Act.

Furthermore, it is apparent that the secretary's interpretation of the statute was in flagrant disregard of its plain meaning. In view of the strong language of the Supreme Court of Pennsylvania in the *McAllister* case, supra, (decided some 4 years before the letter), it is incredible that an official of the Commission would believe that return of part of the purchase price by a producer to a dealer did not violate the spirit and intent of the Milk Control Law. It strains credulity beyond the breaking point to accept as a reality of life a situation where a farmer would voluntarily and without suggestion, pressure, threat, or duress, return part of the money which he had received for milk which he had sold to a dealer. The evidentiary rulings on these points and others raised on post trial motions were not error.

##### MITIGATION OF DAMAGES

■ The jury was instructed that proof of a technical conversion, without more, entitled the plaintiffs to only nominal damages, that if any further sums were to be awarded, the burden was on the plaintiffs to establish actual loss, and that the defendants were entitled to show in reduction of damages facts or circumstances tending to reduce the amount required to compensate the plaintiffs.[14] The jury in answer to an Interrogatory found no reduction was to be made.[15]

---

14. 18 Am.Jur.2d, Conversion § 102.
 89 C.J.S. Trover and Conversion § 180.

15. "6. Are the defendants entitled to a reduction in the damages claimed by the plaintiffs?

 Yes _____ No ⎷ "

The case was to be tried on liability first, with damages to be determined thereafter by a Master in a series of computations. This arrangement was necessary because there are several hundred claimants involved and the amount of damage which each sustained must be determined on a number of variables including the quantity of milk sold by the Co-Op for the individual, the percentage of butterfat adjustment which would be applicable, incentive arrangements for sale of milk during certain seasons of the year, etc. A computation of this magnitude would have been impracticable for a jury.

On the other hand, as a class, the plaintiffs contended that their loss amounted to the total of the rebates paid to the dairies. The defendants contended that there was in fact no such loss because it would have been impossible for the plaintiffs to have sold their milk on the open market at any better price than that which the Co-Op secured.

To buttress their position, the defendants submitted extensive marketing data, complete with charts and the testimony of an expert witness. It was against this background of the damages which might be available to the class as a whole that the jury was permitted to determine if the plaintiffs were entitled to nominal damages, the full amount of the rebates as they claimed or some lesser amount which might be determined in conjunction with the defendants' evidence on market conditions.

"In an action for conversion, although the plaintiff is generally entitled to recover the value of the property converted, the defendant is permitted to show the existence of facts which would make it unjust to allow the plaintiff to recover such amount." 18 Am.Jur.2d, Conversion § 102.

"As a general rule defendant is entitled to show in mitigation or reduction of damages any facts or circumstances which would tend to reduce the amount required justly to compensate plaintiff for the actual loss he has sustained as the proximate result of defendant's act." 89 C.J.S. Trover and Conversion § 180.

Here the jury determined that the plaintiffs were entitled to the full amount of their loss and this was in its province to do so.

The defendants contend that they were misled by the pretrial arrangements with respect to reference to a Master and were unprepared to meet the reduction of damage issue at the trial. However, the contention is not well taken. The defendants were thoroughly prepared on the issue of market conditions and produced such extensive and exhaustive evidence that it is difficult to conceive of any other testimony which could be found to have a bearing on the matter.

The evidence on this point was that which would apply to the class of the plaintiffs as a whole. It does not and is not intended to bar testimony on other matters of defense which might apply in the assessments of damages in individual cases, although, certainly, the matter of market conditions has been resolved by the jury's finding.

It may well be, as the plaintiffs contend, that the defendants were not even entitled to have this matter submitted to the jury. However, we do think the question was fairly raised by the evidence and was within the jury's domain. The charge to the jury on this point was an accurate statement of the general law.

The defendants contend that it was error to submit Interrogatories on this point to the jury but it's difficult to follow this reasoning when it is noted that a favorable answer to the question would have been beneficial, but the failure to submit the issue would have deprived the defendants of an opportunity to substantially better their position.

The defendants also objected to the interrogatory following which would have permitted a reduction in percentages,[16] claiming there was no basis for

---

16. "7. If the answer is 'Yes', indicate what percentage of reduction the defendants are entitled to. _____."

the jury's determination. The market conditions testimony, however, if accepted by the jury, could have furnished a guide and its findings would have been no more speculative than many items of damage which juries pass upon daily. In any event, since it was determined that no reduction was applicable, the objection is moot.

## DAMAGES RECOVERABLE BY THE CLASS

In accordance with the opinion of the Court of Appeals suggesting consideration of the application of Rule 23, arguments were held and Orders were entered by this Court on January 22, 1969 and February 28, 1969.

The first Order determined that the matter should be handled as a class action, and the second required that a notice be given to each eligible member of the Co-Op, advising that he could be excluded from the class and participation in the suit if a request was submitted in writing and sent to the Clerk of the Court. Absent such affirmative action, those who were members of Erie-Crawford during the years in question would be considered as part of the class,[17] the notice adding, "the judgment entered, whether favorable or not, will be binding upon you and no other suit may be brought by you on the claims alleged in this lawsuit." The potential participants were further advised, "If the defendants are found to be liable to the class members, in order to recover any amount from them, you will be required to prove your specific damages."

Plaintiffs now assert that they should be entitled to recover all of the damages sustained by the class, even by those who had requested exclusion from the suit.

██ We reject this contention and hold that only the damages sustained by members of the class as presently constituted may be assessed against the defendants.

Plaintiffs' position is unsound in two respects. First, if the present members of the class wish to collect all of the damages sustained by all without distributing the shares to those who chose not to continue in this suit, then there would be unjust enrichment. The law of Pennsylvania, as in other common law jurisdictions, is that tort actions are brought for compensation for loss suffered. Absent punitive damages, no other recovery should be permitted. Second, if damages could now be awarded to those who had previously decided not to participate, the whole purpose of giving notice under 23(d) would be thwarted and the Rule would be in shambles.

The procedures of Rule 23 are designed to facilitate the disposition of litigation where large numbers of litigants are involved. It has already raised many practical problems and if the procedure is to continue to serve the purpose for which it was designed, it must be carefully utilized.

Professor Charles Alan Wright in his discussion of class actions, 47 F.R.D. 169, 181 said:

> "Critical to the entire operation of the revised rule is the effect of the judgment. It is clearly contemplated that every judgment in every class action will bind all of the members of the class, except for those who have asked to be excluded in a (b) (3) action. * * *

> "The absentee has an absolute right to be excluded from a (b) (3) action. If he does, and the judgment ultimately is favorable to the class, he should not be entitled to rely on it as collateral estoppel, in those jurisdictions that departed from the requirement of mutuality for estoppel. To permit him to do this would make a mockery of the (b) (3) procedure, and would restore in a different form the 'one way' intervention that the amended rule was expressly intended to preclude. Notions of collateral estoppel are not so inexorable that a party who has affirmatively obtained exclusion from a

---

17. They were also given the option of retaining their own attorney if that was desired.

judgment need be allowed later to claim the benefits of the judgment."

A fortiori, an excluded plaintiff should not be entitled to share in the damage award nor should a defendant who thought he was dealing with damages sustained by several hundred suddenly be required to meet those claimed by a thousand.

Finally, if there was any doubt, Rule 23(c) (3) provides:

"The *judgment* in an action maintained as a class action under subdivision · * * * (b) (3), whether or not favorable to the class, *shall include and specify or describe those to whom the notice* provided in subdivision (c) (2) *was directed, and who have not requested exclusion,* and whom the court finds to be members of the class." (emphasis provided)

Appropriate Orders will be entered.