470

Robert M. KNUTH, on behalf of himself and on behalf of all other members of the class who are similarly situated, Appellants in No. 71–1541,

v.

ERIE–CRAWFORD DAIRY COOPERATIVE ASSOCIATION, Appellant in No. 71–1542.

Appeal of Howard YOST, in No. 71–1543.

Appeal of WILLIAM COLTERYAHN & SONS, INC., in No. 71–1544.

Appeal of LINGERLIGHT DAIRY COMPANY, in No. 71–1545.

Appeal of ERIE DAIRY LAND, INC., in No. 71–1546.

Appeal of GOLDEN GLOW DAIRY, in No. 71–1547.

Appeal of YAPLE'S DAIRY, INC., in No. 71–1548.

(D. C. Civil Action No. 65–1328)
Nos. 71–1541 to 71–1548.

United States Court of Appeals, Third Circuit.

Argued April 17, 1972.

Decided June 28, 1972.

Paul A. Simmons, Monongahela, Pa., for appellants.

W. Walter Braham, Jr., Kirkpatrick, Lockhart, Johnson & Hutchison, and Frank L. Seamans, Eckert, Seamans, Cherin & Mellott, Pittsburgh, Pa., for appellees.

Before ADAMS, GIBBONS and MAX ROSENN, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

This case is before us for the second time. Originally it came before us on the appeal of the class representative (the plaintiff) from an order dismissing his complaint for failure to state a claim. The complaint was in three counts and the appeal challenged only the dismissal of Counts I and III. Count I alleged violations of sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2 and sought damages under section 4 of the Clayton Act, 15 U.S.C. § 15. Count III alleged a conversion under Pennsylvania law and claimed pendent jurisdiction. We held that the allegations of Count I, though confused and obscure, alleged a claim under § 4 of the Clayton Act sufficient to escape dismissal under Fed. R.Civ.P. 12(b)(6). We remanded with a direction that the court follow the procedures specified in Fed.R.Civ.P. 23(c) in determining whether a class action was properly involved, and if so, the proper ambit of the class.[1] We also held that the conversion count was within the district court's pendent jurisdiction. Knuth v. Erie-Crawford Dairy Coop. Association, 395 F.2d 420 (3d Cir. 1968).

Following the remand the district court caused notice to be mailed to 1200 Pennsylvania milk producers whom the plaintiff sought to represent. Approximately 900 of the 1200 opted out. Thereafter the case proceeded to trial before a jury on the issue of liability only. At the conclusion of the plaintiff's case the district court granted defendants' motion for a directed verdict on Count I and denied, except for two defendants, a similar motion on Count III. That count went to the jury at the end of defendants' case on written interrogatories which resulted in verdicts against each remaining defendant. Thereafter the district court, 326 F.Supp. 48, granted motions for judgments notwithstanding the verdict in favor of several individual defendants. It also granted a motion for judgment notwithstanding the verdict in favor of all defendants contrary to jury interrogatory Number 8 on the issue whether the Pennsylvania six year statute of limitations had been tolled. It ruled that damages would be limited to those suffered by the class members who had elected against opting out of the class action. The district court certified that there was a controlling question of law the disposition of which would materially advance the ultimate termination of the litigation. We granted a petition for an interlocutory appeal. 28 U.S.C. § 1292 (b). The plaintiff and those defendants against which a verdict was allowed to stand have appealed. The several appeals present a variety of issues.

The dispute arises out of the persistent and largely futile efforts of the Pennsylvania Milk Control Commission (the Commission) acting under a statutory mandate to insulate the Pennsylvania dairy industry from price competition.[1a] The plaintiffs-producers are dairy farmers whose herds produce milk in Erie and Crawford Counties in western Pennsylvania. The defendant Erie-Crawford Dairy Coop. Association (the Cooperative) is a non-profit agricultural cooperative marketing association organized under Pennsylvania law, of which the plaintiffs are member-stockholders. The producers, during the relevant period, entered into contracts with the Coopera-

---

1. Hereinafter alternatively referred to as the plaintiffs and the producers.

1a. 31 Pa.Stat.Ann. § 700j–101 et seq. See Milk Control Board of Pa. v. Eisenberg Farm Products, 306 U.S. 346, 59 S.Ct. 528, 83 L.Ed. 752 (1939); Penn Dairies v. Milk Control Commission, 344 Pa. 635, 26 A.2d 431 (1942), aff'd, 318 U.S. 261, 63 S.Ct. 617, 87 L.Ed. 748 (1943); Colteryahn Sanitary Dairy v. Milk Control Commission, 332 Pa. 15, 1 A.2d 775 (1938).

tive whereby each agreed to consign all milk and cream produced by him to the Cooperative for sale ". . . to such parties and by such methods as the Board of Directors shall deem to be to the best advantage of the Producer." (Exhibit 109, Article Third). Under the standard contract the Cooperative has the right to pool the proceeds of sale of milk or cream derived from all the producers. It then must pay each producer his share of the proceeds of sale ". . . after making all authorized deductions hereinafter provided for or authorized by law." (Exhibit 109, Article Third). The agreement provides for deduction from the proceeds of sale of amounts to cover statutory reserves, dividends on preferred or common stock, and ". . . all operating expenses including transportation, selling and processing costs . . . ." (Exhibit 109, Article Fourth).

The individual defendants (the directors) are producers who served as directors of the Cooperative between the years 1957 and 1965. With the exception of Howard Yost none were officers of the Cooperative during those years. Two individual defendants made a successful motion for a directed verdict. The jury verdict found the remaining individual defendants liable for conversion, but with the exception of Yost all were granted judgment notwithstanding the verdict.

From 1957 through 1965 the Cooperative sold milk and cream to various milk distributors (the handlers)[2] who processed the milk and sold it either as fluid milk or in manufactured milk products. During those years a portion of the milk industry in the Erie and Pittsburgh markets was subject to regulation by the Commission. The Commission specified minimum producers prices which handlers were required to pay for milk received at Pennsylvania plants from Pennsylvania producers. For purposes of state regulation the Cooperative is deemed a producer. Each of the handler defendants in all or part of the years 1957 through 1965 had a plant in Pennsylvania and bought milk for that plant from the Cooperative. At the same time, each handler defendant was at all times free under Pennsylvania law to purchase milk for its Pennsylvania plants from producers in adjoining states. The jurisdiction of the Commission did not extend to such interstate sales of milk. The only practical limitation on the ability of a Pennsylvania milk handler to purchase milk from producers in other states was the cost of refrigerated transportation.

Under the Commission's regulations the price paid by handlers to producers depended upon a system of classification reflecting the use to which the milk was put by the handlers, although all milk met the same standards of quality and purity. In western Pennsylvania in the years in question the Commission had established four use classifications:

Class I Bottled Drinking Milk, Skim Milk, Buttermilk

Class II Fluid Cream, Ice Cream Mix, Cottage Cheese, Sour Cream

Class III Butter, Cheese, Skim Milk Powder

Class IV Evaporated Milk

Class I is called "fluid" milk. All other classes are called "non fluid" or "manufactured" milk. At all relevant times

---

2. The following handlers received price adjustments and were named as defendants in this action:

Colvins Dairy, Erie, Pennsylvania
Erie Dairyland, Inc., Erie, Pennsylvania
Golden Crown Dairy, Erie, Pennsylvania
Golden Glow Dairy, Erie, Pennsylvania
Klein's Dairy, Farrell, Pennsylvania
Lingerlight Dairy Co., New Castle, Pennsylvania

Rieck Dairy Co., Erie, Pennsylvania
Schneider's Dairy, Inc., Pittsburgh, Pennsylvania
Snee Dairy, Inc., Pittsburgh, Pennsylvania
William Colteryahn & Sons, Pittsburgh, Pennsylvania
Yaples Dairy, Inc., Erie, Pennsylvania
Schruer's Dairy, Edinboro, Pennsylvania

the Commission's fixed price for Class I of "fluid" milk was much higher than that for all other classes. Thus it was in the best interest of a producer to dispose of his milk to a handler whose resale business produced a high Class I utilization.

When the producer sent his milk to the Cooperative he did not know for what purpose it would be used. Moreover the proceeds of sale which he would ultimately receive were determined only after three steps:

(1) Calculation of the handler's blend price. At the end of each month the handler reported to the Commission and to the Cooperative its utilization in each class. The handler paid a price per hundred-weight calculated by applying to the class prices fixed by the Commission a percentage of utilization in that class. The result was a blend price per hundred-weight, which would vary downward from the Class I price depending on the percentage of "non fluid" uses to which the milk had been put. The blend price was further adjusted to reflect the butterfat content of the milk received from various sources.

(2) Calculation of the Cooperative's pool price. The Cooperative collected the monthly blend price from each handler. These receipts were all pooled. From the pooled receipts the Cooperative deducted the operating expenses and reserves referred to hereinabove. The total number of pounds of milk received each month was then divided into the net pool proceeds to derive the pool price per hundred-weight for each hundred-weight sold, calculated on the basis of a standard butterfat content.

(3) Calculation of each producer's share of the proceeds. The Cooperative would adjust each producer's share of the proceeds depending on the cost of collecting his milk on the

farm and the butterfat content of the milk he shipped.

During the years in question milk production rose substantially throughout the Northeast. At the same time the prices fixed by the Commission for intrastate sale of Pennsylvania milk were substantially higher than the price of similar milk produced in Ohio, New York, and other states. Thus even when the cost of refrigerated transportation was taken into account each handler with a plant in western Pennsylvania could supply the fluid milk requirements of that plant with out of state milk at prices substantially lower than the Class I price fixed by the Commission.

This left the Cooperative with these choices:

1. It could sell its members' milk to handlers outside of Pennsylvania free of price control by the Commission, at the available market price which was lower than the Pennsylvania Class I Price.

2. It could sell its members' milk to Pennsylvania handlers for non-fluid uses at a price level where the Pennsylvania non-fluid price and the interstate price equalized.

3. It could seek to hold as customers those handlers whose resale business resulted in a high utilization of fluid milk by offering to meet the interstate price.

The third alternative was illegal under Pennsylvania Law.[3] It was, however, the course in fact pursued in a number of instances.

### The Antitrust Claim

Plaintiff's antitrust claim, as explicated in our earlier decision, was that the defendants conspired to fix the price of milk shipped into Pennsylvania, to boycott out of state producers, and to suppress and eliminate competitors by a concerted refusal to deal with out of state producers, all to the damage of the

3. The defendants offered to prove that the Commission knew of the price adjustments and approved of them. This evidence was excluded.

Pennsylvania producers. While it was not then clear how the Pennsylvania producers would have been injured in their business or property by such activity, the complaint so alleged, and we held that the plaintiff should be given an opportunity to offer evidence. At the end of the plaintiff's case the factual picture had become much clearer.

First, there is no evidence of any horizontal activity among any of the defendant handlers looking toward boycotting or toward price fixing on any level. *Compare, e. g.,* United States v. General Motors Corp., 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966). The Cooperative dealt separately with each handler, and there is no evidence that any handler was *aware* of the arrangement for rebating worked out with any other. Next, there is no evidence that the Cooperative attempted to impose upon any handler or that any handler agreed to any vertical arrangement respecting resale milk prices. *Compare, e. g.,* Sanitary Milk Producers v. Bergjans Farm Dairy, Inc., 368 F.2d 679, 689 (8th Cir. 1966); United States v. Milk Drivers and Dairy Emp. Union, Local 471, 153 F.Supp. 803 (D.Minn. 1957). The handlers' resale prices were actually fixed by the Commission. The evidence is that the Cooperative negotiated separately with each handler about the net price it would receive for the milk of its producers. Various methods or subterfuges for avoiding the Commission's wholesale fixed prices were resorted to. In each instance the pricing arrangement was agreed to between the Cooperative and the handler prior to the sale. In all cases the handler filed his utilization report with the Commission and paid the Cooperative the official blend price calculated on the basis of that report. In the case of some handlers the Cooperative had a prior agreement that the official blend price would be adjusted to reflect an agreed rather than actual utilization. Thus a handler who actually used 80% of the Cooperative's milk for Class I purposes might receive an adjustment on his blend price to reflect an agreed

60% Class I use. In other cases handlers received agreed adjustments at a fixed rate per hundred-weight, agreed adjustments to the price in the Youngstown federal milk marketing order, agreed adjustments of fixed amount per quart of milk sold at retail, a flat dollar amount per month, or an agreed adjustment for handling milk of low butterfat content. In each case the method of calculating the adjustment was negotiated separately between the Cooperative and a single handler prior to the sale. In each case the adjustment was made in the form of a rebate from the official blend price. The plaintiff's own evidence suggests that the economic effect of the price adjustments was that the Cooperative received more for its members milk than it would have received had it insisted on the official blend price fixed by the Commission and that it thereby lost as customers those handlers with high Class I utilization.

This evidence, the district court held, was insufficient to go to the jury on the antitrust claim. We agree. The plaintiff's case establishes that the Cooperative, a sales agent with authority to sell milk to such parties and by such methods as its Board of Directors deemed to the best advantage of its members, negotiated individual contracts of sale with individual handlers at the best prices it could obtain from time to time in the face of competition from out of state producers. The handlers did not act in concert for any purpose. The Cooperative and individual handlers acted in concert only with respect to the price of individual sales contracts. There is no evidence even of conscious parallel action on the part of the handlers to exact larger rebates, to stabilize prices at any level or to boycott out of state producers. Indeed the evidence is that some handlers negotiated for better prices than others. Undoubtedly the officers and directors of the Cooperative acted with the common purpose of obtaining the best price they could obtain for their members' milk. Each handler, on the other hand, exacted the best price concession it could

**476**

obtain for itself. Such individual sales contracts, negotiated at arm's length without knowledge on the part of the purchasers of the prices being charged others similarly situated, cannot be regarded as contracts or combinations in restraint of trade. While the individual contracts may have been illegal under Pennsylvania law, they were not illegal under the antitrust laws.

■ Plaintiff argues that conscious parallel action among all of the defendants was sufficiently inferable from the evidence that the existence of a conspiracy was a jury question. No specific evidence is referred to, and our own review of the record discloses no evidence tending to show that any handler was even aware of the price arrangement of any other. Evidence from which a conspiracy may be inferred is simply absent.

■ Having advanced a contention not supported by an evidence plaintiff goes on to concede:

"However, the Plaintiffs are willing to rest their plea for summary judgment [4] on the undisputed and admitted facts that each of the Dairy Defendants [handlers] entered into a separate agreement with the Defendant Erie-Crawford [the Cooperative] to accept rebates on the price of milk sold and delivered to them which restrained commerce between the States in violation of Section One of the Sherman Act, thereby making each Dairy Defendant liable for the amount of money received by it as a rebate and making Defendant Erie-Crawford liable in damages for all of the several transactions with all of the Dairy Defendants."

(Appellant's brief in 71–1541 at 30). Plaintiff's ultimate contention, then, is that an individual price rebate arrangement is, without more, a per se violation of Section One of the Sherman Act. We know of no case which has ever so held, and the same contention has been rejected. Checker Motors Corporation v. Chrysler Corporation, 405 F.2d 319 (2d Cir. 1969), cert. denied, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969). The district court properly granted a directed verdict on the antitrust claim.

### The Conversion Claim

The pendent claim for conversion under Pennsylvania law rests upon the same facts recited above. Plaintiff's theory of the case is that the payment of the rebates by the Cooperative was a conversion of money belonging to the members and that the Cooperative and the recipients are jointly liable for these amounts. The district court accepted plaintiff's theory, and charged the jury:

"The property which the plaintiff contends was converted in this case was money which came into the hands of the cooperative association. The plaintiff contends that when the co-op gave money back to the dairymen or handlers, this deprived the plaintiff of the possession of that money. They contend, further, that they did not consent to this transfer of the money to the dairies, and that the co-op had no lawful justification for the action in giving back the money to the dairies.

Plaintiffs contend, also, that the dairies had no right to receive this money, knowing that it was the lawful property of the plaintiffs.

The defendants, on the other hand, contend that because of the marketing agreement which each of the plaintiffs had signed, that they authorized the defendant to sell the milk at the best price possible, or as the contract phrases it, 'to the best advantage of the farmers.' They claim that it would not have been possible to sell the milk had not an agreement been made to refund part of the price to the dairies, and that by giving the milk to the co-op on a consignment, the farmers authorized such transaction.

4. The plaintiff made a motion for a new trial and for summary judgment on the antitrust claim at the end of the case.

\* \* \* \* \* \*

The contract between the farmers and the co-op must be read in light of the existing law, that is, it is implied in every contract, even if it is not written there, that it must be performed in accordance with the law. Therefore, when a contract provides that the milk must be sold and disposed of to the best advantage of the producer, it is understood to mean 'in accordance with the law.'

Therefore, I instruct you that when the farmers or producers turned over the milk to the co-op, it was with the condition, and as part of the contract, that the milk be sold at the legal price." (912–21b).

The court then read 31 Pa.Stat.Ann. § 700j–807 and charged:

"Therefore, the term of an agreement between the co-op and a dealer which required the co-op to refund part of the officially set price for the milk was illegal and could not be enforced by the dealer. There was, therefore, no legal way in which the co-op could have been forced to pay back to the dealer any amount which it had agreed upon in advance as a refund or as a discount." (923b).

The only defense which the court permitted the jury to consider was the defense that some members of the class might knowingly have consented to the rebates. Summarizing at a later point the court charged:

"Now, to sum up once again the elements of a conversion—it is the deprivation of the right of property in, and in this case, money, or other interference with the money without the owner's consent, and without lawful justification. If a conversion occurs, and the plaintiffs prove the damages, the damages recoverable is the actual loss to the plaintiffs." (932b).

The foregoing amounted to a directed verdict that the illegal rebates were conversions, and it is not surprising how the jury answered interrogatory No. 1:

"Q. Were the plaintiffs deprived of money which they had a right of possession by the payment of rebates?

A. Yes." (430a).

The jury also answered these interrogatories on damages:

"5 [Q] Did the conversion of plaintiff's property by the defendants result in only nominal ($1.00) damages to the plaintiffs?

[A] No.

6 [Q] Are the defendants entitled to a reduction in the damages claimed by the plaintiffs?

[A] No." (431a).

These interrogatories and answers must be read in light of the court's charge on damages. Having in effect charged that a conversion had taken place, it then charged:

"If a plaintiff proves a conversion without anything more, he is entitled to nominal damages; that is, one dollar. If he is to recover more than nominal damages, he must prove the actual amount of his loss.

The plaintiffs in this case claim that the amount of rebates is the actual amount of their loss, since they maintain that nothing further was to be taken from this amount of money, all authorized deductions having previously been taken out." (926–27b).

The court then referred to the fact that the amount of the refunds had been stipulated, and continued:

"Even though the defendants may be guilty of a technical conversion, they are entitled to show in reduction of damages any facts or circumstances which they claim would tend to reduce the amount required justly to compensate the plaintiffs for the actual loss they sustained as the proximate result of the defendants' acts.

Just as the burden of proof of actual loss is upon the plaintiff, the bur-

478

den of proof of reduction of damages is upon the defendants." (927b).

Thus the court charged, in effect, that the stipulated rebates proved the actual loss, and that the burden was on the defendants to show any reduction in damages. Reference was then made to the evidence tending to show that if the rebate arrangements had not been made the price obtained in the market place would have been lower. But the court effectively ruled out consideration of any of that evidence by charging that ". . . if there was a concealment by the defendants which prevented the plaintiffs from taking steps to secure better prices for their milk, then a reduction in damages to that extent would not be proper." (929b). Thus the only question left to the jury was whether the producers knew of the rebate practices of the Cooperative. If the illegal rebates were concealed the defendants were liable for the full amount.

This charge, defendants claim, was error in two related respects. They claim, first, that the evidence did not establish that the plaintiffs had a property right in the Cooperative's money, and hence that no conversion of that money took place. Secondly they claim that by accepting in full the theory of conversion of the money, the court relieved the plaintiff of the burden of establishing an essential element of tort claim—actual damage and loss.

■ The relationship between the Cooperative and the producers is not in dispute. It is defined in a written agreement. (Exhibit 109). Under that agreement the Cooperative is a consignee agent with a power of sale. It is authorized to blend the milk of all the members and to sell all that milk. It is authorized to pool the proceeds of sale, to deduct reserves for dividends and for capital purposes, and to pay all operating expenses, including transportation, selling and processing costs. It is authorized to calculate what part of the net remaining proceeds is payable to each member, taking into account the varying transportation costs in collecting his milk

and its varying butterfat content. The Cooperative is a separate legal entity with a board of directors, officers and stockholders. While the producers may have retained title to the consigned milk until sale, it is quite clear that the members do not have title to the proceeds of sale. Each has only a contract right to be paid by the Cooperative a sum of money calculated in accordance with his agreement. At best each has a right to an accounting from his debtor-agent. The agreement set forth in Exhibit 109 must be contrasted with Supervised Agency Accounts such as we construed in Dubern v. Girard Trust Bank, 454 F.2d 565 (3d Cir. 1972).

■ Under Pennsylvania law conversion is the "deprivation of another's right of property in, or use or possession of a chattel, or other interference therewith, without the owner's consent and without lawful justification." Cenna v. United States, 402 F.2d 168, 170 (3d Cir. 1968); Stevenson v. Economy Bank of Ambridge, 413 Pa. 442, 451, 197 A.2d 721, 726 (1964); Gottesfeld v. Mechanics & Traders Ins. Co., 196 Pa. Super. 109, 115, 173 A.2d 763, 766 (1961). A taking of a person's property with consent to use the property for one purpose, but with the intent to use it for another purpose may be a conversion. Cenna v. United States, supra at 170; Gottesfeld v. Mechanics & Traders Inc. Co., 196 Pa. Super. at 115, 173 A.2d at 766. In this case it may be that the Cooperative's authority as a consignee for sale was limited to sale at the prices fixed by the Commission. But if any conversion of the plaintiff's property took place it was conversion of milk, not of money.

■ Assuming, as did the district court, that the Cooperative's authority to sell the milk was limited to sale at prices set by the Commission, there is evidence of a conversion of milk. But there is no evidence in the plaintiff's case that this conversion caused any damage. The measure of damages for conversion is the market value of the property converted. Restatement (Sec-

ond) of Torts § 222A (1965), Restatement of Torts § 927 (1939). *See* Guido v. Hudson Transit Lines, Inc., 178 F.2d 740, 742 (3d Cir. 1950); Bumbarger v. Walker, 193 Pa.Super. 301, 164 A.2d 144, 150 (1960); Holt v. Pariser, 161 Pa.Super. 315, 54 A.2d 89 (1947); *cf.* Dubern v. Girard Trust Bank, supra. The limited evidence in plaintiff's case tends to show that the rebating arrangements, though producing net prices lower than those fixed by the Commission for a given use class, produced more revenue than would have been produced by attempts to sell in the open market. But by permitting the plaintiff to proceed on a theory that money, not milk, was converted the district court relieved him of the burden of establishing that the Cooperative received less than the actual market value of the milk which it sold.

■■ Moreover, the defendants urge, the effect of the district court's acceptance of the conversion of money theory was to grant partial rescission, or more precisely reformation, of fully executed, though illegal, contracts of sale. The Restatement of Contracts § 605 (1932) states:

"Where money has been paid or goods have been delivered under a bargain containing illegal provisions the money or the value of the goods can be recovered so long as the illegal part of the bargain is wholly unexecuted, unless entering into the bargain involves serious moral turpitude on the part of the plaintiff."

Comment a to § 605 states:

"Where any illegal performance as all or part of the consideration in an indivisible contract has been actually rendered, it is clear that nothing, under the rule stated in the Section, can be recovered."

*See also* Restatement of Restitution § 140, Comment a (1937). Although no Pennsylvania case has been called to our attention which refers to these Restatement provisions, it seems clear from earlier Pennsylvania cases that Pennsylvania would treat a fully executed illegal contract as a matter in repose. *See, e. g.,* McKee v. Verner, 239 Pa. 69, 74, 86 A. 646 (1913); Blystone v. Blystone, 51 Pa. 373, 374 (1865); Ankeny v. Lohr, 99 Pa. Super 203, 206 (1930). Even a contract voidable for fraud or misrepresentation cannot be avoided in part. Restatement of Contracts § 487. Yet the court's charge in effect voided the contract in part by requiring the defendants to pay more for the goods purchased than they had agreed to pay. It did so, of course, on behalf of principals who claim their agent lacked authority to make an illegal contract. But parties contracting through an agent have no greater rights with respect to rescission or reformation of executed illegal contracts than do parties who have acted directly. Looked at from the standpoint of the law of agency the district court's wholehearted acceptance of the plaintiff's theory of the case was also improper. The Cooperative was a sales agent. The governing rule is set out in Restatement (Second) of Agency § 424 (1958):

"Unless otherwise agreed, an agent employed to . . . sell is subject to a duty to the principal, within the limits set by the principal's directions, . . . to use reasonable care to obtain terms which best satisfy the manifested purposes of the principal."

Comment g to § 424 provides:

"The violation of duty by the agent may be selling to a third person at too low a price something which he is otherwise authorized to sell. In this case, the principal is entitled to recover the thing in specie or its value from the purchaser, if the agent had no power to bind the principal. Whether or not the transaction was binding upon the principal as to the purchaser, the principal is entitled to recover from the agent the difference between the amount received and the value of the property sold at the time of sale, or its highest value within a reasonable time after the principal acquires notice of the sale, whichever is larger; or the amount which the agent would have

480

received if he had obeyed the principal, with interest from the time of sale. . . ."

 *See also* Restatement (Second) of Agency § 424, Comment h; Restatement (Second) of Torts § 222A(1), Comment c, § 225, Comment d. The key element in measuring damages for a conversion, by a sales agent or otherwise, is the value of the product converted. The district court's charge effectively removed this element from the jury's consideration first by charging that money rather than milk had been converted, next, by placing on the defendants the burden of proof on damages, and finally, by introducing into the determination of value of the thing converted the element of concealment, which on the value of the thing converted was irrelevant.

Clearly the jury verdict based upon the court's acceptance of the plaintiff's simplistic but erroneous theory of the case cannot be allowed to stand. The defendants assert that they should have been awarded judgment notwithstanding the verdict because the plaintiff failed completely to prove any damage. *See, e. g.*, Bruce Lincoln-Mercury, Inc. v. Universal C. I. T. Credit Corp., 325 F.2d 2, 14 (3d Cir. 1963); Openbrier v. General Mills, Inc., 340 Pa. 167, 16 A.2d 379 (1940); Mike v. Lian, 322 Pa. 353, 185 A. 775 (1936). In that posture, defendants urge, we should simply reverse. If this were not a class action we would do so. By adopting and pursuing an erroneous view of the law of conversion, the plaintiff, a class representative, neglected to make any attempt to prove that the prices obtained by the Cooperative from the several handlers was less than the price available in the market place. From the evidence presented in the defendants' case and from some concessions made by plaintiff's witnesses it seems unlikely that any such proof is available. But in view of the fact that some 290 class members were relying on the plaintiff's representation we reluctantly conclude that a new trial may be more appropriate than a reversal.

Fed.R.Civ.P. 50(d) provides that if the appellate court reverses a judgment denying a motion for judgment notwithstanding the verdict, nothing in the rule precludes it from determining that the appellee is entitled to a new trial. In Neely v. Martin K. Eby Construction Co., 386 U.S. 317, 87 S.Ct. 1072, 18 L.Ed.2d 75 (1967) and Iacurci v. Lummus Co., 387 U.S. 86, 87 S.Ct. 1423, 18 L.Ed.2d 581 (1967) the Supreme Court has indicated that the courts of appeal have discretion to enter judgment in favor of the party who moved for judgment notwithstanding the verdict, to order a new trial, or to remand to the trial court to afford the plaintiff an opportunity to present a motion for a new trial. The latter course is most appropriate here. The plaintiff as appellee in the defendant's appeal did not, as Rule 50(d) provides, brief any grounds entitling him and the class he represents to a new trial in the event we concluded, as we have, that the trial court erred in denying the motion for judgment notwithstanding the verdict. It is not at all clear that on the pleadings before the district court the case could have been submitted to the jury on the theory that milk rather than money had been converted. If that theory is a complete departure from the case pleaded through the pretrial conference a new statute of limitations problem may be presented. Moreover the plaintiff may not be in a position to make an offer of proof on the issue of damage or loss from the illegal milk sales. These matters should, we think, be explored by the district court on a motion for a new trial.

Since we are remanding for consideration by the district court of a motion for a new trial it is appropriate to deal with a number of other issues raised by the several appeals.

### The Director Defendants

The plaintiff appeals from the order granting judgment notwithstanding the verdict to the individual director defendants, Hanas, Raybuck, Culbertson, Tris-

cuit, Boyd, Henry, Black, Mitchell, and Spaid. This ruling left standing only the verdict against director-officer Yost, who participated directly in the rebate negotiations. The other director defendants, the evidence disclosed, knew about and approved of the rebate policy. They believed, in fact, that nothing else could be done to preserve the Cooperative's markets. After reviewing the Pennsylvania cases on directors' liability the district court concluded that Pennsylvania would not impose personal tort liability on the knowledgeable, approving, but not directly participating directors. The issue is a difficult one. There are no Pennsylvania cases directly in point. Perhaps the closest is Cohen v. Maus, 297 Pa. 454, 147 A. 103 (1929), which exonerated directors from liability in conversion because:

> "There was no testimony showing that any of the defendants, save Maus, knew of the sale [constituting the conversion], and that none of them had any knowledge of the sale of it . . and it was not shown that they had wilfully, and knowingly, participated in the trespass. . . . Here persons who were directors in a corporation are sought to be held individually liable for a conversion of property about which they knew nothing merely because, if they had examined the books of the corporation, they might have ascertained that the conversion had taken place. We cannot lend our assent to the establishment of such a doctrine."

*Id.* at 456–457, 147 A. at 103–104. *See also* Chester-Cambridge Bank & Trust Co. v. Rhodes, 346 Pa. 427, 431, 31 A.2d 128, 130 (1943); Swentzel v. Penn Bank, 147 Pa. 140, 153, 23 A. 405, 415 (1892); compare Armour and Company v. Celic, 294 F.2d 432 (2d Cir. 1961); *See* 3 W. Fletcher, Corporations § 1137 at 782–83 (perm. ed. 1965 rev.) which suggests the rule that an officer of a corporation will not be held personally liable for a tort ". . . unless he specifically directed the particular act to be done, or participated, or co-operated therein."

Our best judgment is that the Courts of Pennsylvania would hold that directors of a sales agent corporation with authority from its principals to sell only at legal prices who knowingly authorize sales at less than those prices have participated in conversions and are personally liable. Thus we will reverse the order granting judgment notwithstanding the verdict to the director defendants. We recognize that if the case is retried on the theory that milk rather than money was converted the evidence may disclose reasons why they should not be held liable. For example, the evidence may disclose that they authorized illegal sales only at or above the available market price, but that unknown to some of them some sales took place below that price, and hence caused damage.

### The Statute of Limitations

The district court submitted to the jury an interrogatory for each defendant asking if the Pennsylvania six year statute of limitations is a defense to events which occurred before May 31, 1960. In each case the jury answered no. The district court granted judgment notwithstanding the verdict as to all events prior to that date. The parties agree that May 31, 1960 is the date beyond which recovery would be barred by 12 Pa.Stat. Ann. § 31, unless the plaintiff could establish fraudulent concealment. The evidence on the fraudulent concealment issue was not affected by the wrong theory of conversion on which the plaintiff tried the case, and since we have concluded that the grant of judgment notwithstanding the verdict with respect to events prior to May 31, 1960 was correct, we will affirm that order.

The statute of limitations may be tolled if the plaintiff by clear, precise and convincing evidence shows fraudulent concealment by the defendants. *See, e. g.,* Walters v. Ditzler, 424 Pa. 445, 449–450, 227 A.2d 833, 835

(1967); Nesbitt v. Erie Coach Co., 416 Pa. 89, 204 A.2d 473, 476–477 (1964). In Overfield v. Pennroad Corp., 146 F.2d 889 (3d Cir. 1944) this court wrote:

"We are confronted at the outset . . . with the proposition, laid down over and over again in the Pennsylvania decisions that the concealment which tolls the statute must be in an affirmative, independent act of concealment; mere silence or nondisclosure, even by corporate officials is not enough."

146 F.2d at 896 (footnote omitted).

The district court correctly applied the governing standard to the evidence. There was *no evidence of affirmative effort made by any defendant to conceal the price adjustments from the producers.

### The Damages Recoverable

■ Although all but 290 of the class members, after notice pursuant to Fed. R.Civ.P. 23, opted out, plaintiff asserts that he should be entitled to recover all of the damages sustained by the class, even by those who had requested to be excluded. The district court held that only the damages sustained by members of the class as presently constituted would be assessed. We agree. *See* Fed.R.Civ.P. 23(c) (3).

### Application of 46 Pa.Stat.Ann. § 156

■ The defendants contend that the Act of March 21, 1806, Pub.L.No. 558, 4 Sm.L. 326, § 13, 46 Pa.Stat.Ann. § 156 bars the suit for conversion because that statute requires that in all cases where a statutory remedy is provided the statutory remedy must be pursued before resort to the common law.[5] The district court rejected this contention. No decision of a Pennsylvania court has held that the Commission is the exclusive forum. The Milk Control Law, 31 Pa.Stat. Ann. § 700j–1003 provides in part:

"[A]ny person . . . may institute such action at law or in equity . . to enforce compliance with any provision of this act, or to enforce compliance with any rule, regulation or order of the board. . . ."

Possibly the Act of 1806 imposes an exhaustion of remedies requirement if a producer does resort to the Commission pursuant to the alternative remedy in 31 Pa.Stat.Ann. § 700j–1005. *See* Colteryahn Sanitary Dairy v. Milk Control Commission, 332 Pa. 15, 23, 1 A.2d 775, 780 (1938). But it seems clear from § 1003 that the Pennsylvania legislature did not, in enacting the Milk Control Law, intend any preemption. The district court concluded correctly that the existence of an alternative remedy before the Commission did not deprive the court of pendent jurisdiction over the conversion claim.

### Evidence Rulings

The district court refused to admit evidence that the price adjustments they received were deemed to be lawful by the Commission. These offers were rejected because the court ruled as a matter of law that regardless of the Commission's position the rebates were unlawful. The proffered evidence was deemed irrelevant on the issue of conversion since, assuming illegality, good faith was not a defense.

■ We agree that the legality or illegality of the rebates under the Pennsylvania Milk Control Act was a matter of law to be decided by the court. We think, however, that in ruling on some of the proffered evidence of the Commission's attitude about some of the rebate schemes the district court took too narrow a view of the Commission's role. It is true, as the court charged, that 31 Pa.

---

5. "Acts of assembly to be strictly pursued. In all cases where a remedy is provided, or duty enjoined, or anything directed to be done by any act or acts of assembly of this commonwealth, the directions of the said acts shall be strictly pursued, and

no penalty shall be inflicted, or anything done agreeably to the provisions of the common law, in such cases, further than shall be necessary for carrying such act or acts into effect."

Stat.Ann. § 700j–807 prohibits methods or devices whereby milk is bought at a price less than the minimum established for the transaction, whether by discount, rebate, or otherwise. But it is also true that the Commission has a broad discretion under 31 Pa.Stat.Ann. § 700j–801 to modify its milk price orders, and that 31 Pa.Stat.Ann. § 700j–806 provides:

> "The board may likewise fix by official order, the terms upon which milk dealers shall pay producers and others for milk, may prescribe the method of computing payment therefor, and may prescribe a form of written statement to be sent to producers with each payment."

It would seem that much of the proffered evidence tended to establish the Commission's interpretations of its own milk price orders and its approval, as methods of computing payment, of various price adjustment schemes. The Pennsylvania Commission's interpretations of its own regulations ought to be binding on a federal court, at least in instances where there is no Pennsylvania court decision to the contrary. The case of Milk Control Commission v. McAllister Dairy Farms, 384 Pa. 459, 121 A.2d 144 (1956) on which the district court relied is not such a case. In that case the Commission sought judicial enforcement of its own interpretation of its order. In the same category are Milk Control Commission v. Rieck Dairy Division, 193 Pa. Super. 32, 163 A.2d 891 (1960) and Shearer's Dairies, Inc. v. Milk Control Commission, 191 Pa.Super. 574, 159 A.2d 268 (1960).

�In Since the proffered evidence was not admitted we do not know if it would have shown some of the rebate arrangements to have been approved by the Commission. We hold only that if the Commission did so approve it would have been acting within the scope of its authority under 31 Pa.Stat.Ann. §§ 700j–801 to 806.

The order of the district court of April 15, 1971 contains six ordering paragraphs, all of which are before us in one or another of the consolidated appeals. Paragraph 1, denying plaintiff's motions for a new trial and for summary judgment on the antitrust count will be affirmed. Paragraph 2, granting judgment notwithstanding the verdict to the defendants Hanas, Raybuck, Culbertson, Triscuit, Boyd, Henry, Black, Mitchell, and Spaid, will be reversed. Paragraph 3, granting defendants' motions to vacate the jury's verdict in answer to Interrogatory No. 8 on tolling the statute of limitations will be affirmed. Paragraph 4 denying the motions of the defendants Erie-Crawford Cooperative Association and Host for judgment notwithstanding the verdict will be affirmed. Paragraph 5, limiting assessment of damages to the extent of the proportionate share to which members of the class who elected to join in the lawsuit, will be affirmed. Paragraph 6, denying defendants' motions for a new trial on the conversion count will be reversed and the cause remanded for consideration by the district court of a motion by the plaintiff to be served within ten days of the date the mandate of this court is filed in the district court. Each party will bear its own costs.

MAX ROSENN, Circuit Judge (concurring and dissenting).

I fully agree with the majority that the district court properly granted a directed verdict on the anti-trust claim.

I would remand this case, however, for a new trial solely on the issue of whether the directors of Erie-Crawford exceeded their power as agents for the producers and by so doing caused actual loss to the plaintiff class.

I do not find that there has been any conversion, of milk or money, in this case. While I agree with the majority that a conversion is the deprivation of another's right in property, or the unlawful interference with that property, I do not find any such improper activity amounting to a conversion of the consigned milk on the facts before us. A claim based on converting a chattel, the milk in this case, would require the pro-

ducers to show that they had consented to the cooperative's control over the milk for one purpose which was then ignored when the milk was sold. *See* Restatement of Torts 2d § 228. However, a new trial could not show that the cooperative exercised any unlawful dominion over the milk that interfered with any of the producers' rights. There seems no way plaintiff will be able to change the seemingly conceded and inescapable conclusion that the cooperative sold the milk at the prices set by the Pennsylvania Milk Control Commission, precisely as the producers wanted. Furthermore, as Comment (g) to Section 228 makes clear, there is no conversion "unless [the control exercised] amounts to such a serious violation of the other's right of control as to justify requiring the user to pay the full value of the chattel." The plaintiff's own statement of damages illustrates he cannot meet that burden: he seeks only the difference between the Milk Control Commission price and the amount actually received.

However, I would agree with the majority that there was no conversion of funds because the producers did not have a right to immediate title to the proceeds. They possessed only a contractual right to a sum that reflected payments to the cooperative for its services. In addition, in Pennsylvania, it has been determined that when an agent does not exercise unlawful dominion over funds otherwise owing to his principal, he has not committed a conversion, and is at best liable to pay over the sum he has received plus any damages brought about by his negligent conduct. Allegheny By-Product Coke Co. v. J. H. Hillman & Sons Co., 275 Pa. 191, 118 A. 900, 905 (1922).

In light of Pennsylvania law and the facts of this case, I would conclude that the only possible improper action was that the cooperative exceeded its authority under its contracts with the producers. Section 424 of the Restatement of Agency 2d requires an agent to act within the limits set by the principal's directions, and Section 402 declares that the agent shall be liable for any loss incurred because he deviates substantially from his authority to transfer goods to a third person in a sale. Therefore, if an improper sale at too low a price takes place, the principal can recover his actual loss. *See,* Comment (g), § 424, Restatement of Agency 2d.

This action cannot include within its ambit any of the producers. They were not required to follow the duties imposed upon Erie-Crawford under the contracts between the cooperative and the plaintiff class. In addition, they are protected because the agreements they signed with the cooperative were within its implied powers and therefore bound their principals, the producers.

Further, I would conclude that because Erie-Crawford is a cooperative made up of members of the plaintiff class, it cannot be a defendant in this action. A recovery from it would merely take money out of one pocket of a producer and put it back in another pocket. While recovery would be limited to those who are actual members of the class, the class representative asserts that all of the members of the cooperative have been equally wronged. There is then certainly no justification for the non-class members to pay money to class members when they both are assertedly equally innocent and injured.

As a result, that leaves the class only an action against those directors who agreed to a policy which may have exceeded their powers under the contracts between the cooperative and the producers. While I doubt that the plaintiff class will be able to prove any damages from these actions, I agree with the majority that they should have their day in court to present their case.